In the Matter of the **RAILWAY REORGANIZATION ESTATE, INC., f/k/a Delaware and Hudson Railway Company, a Delaware corporation, Debtor.**

**Bankruptcy No. 88–342.**

United States Bankruptcy Court, D. Delaware.

Sept. 30, 1991.

See also 127 B.R. 756, 133 B.R. 578.

Henry N. Herndon, Jr., Eduard F. von Wettberg, III, P. Clarkson Collins, Jr., Barbara MacDonald, Joanne B. Wills, Wilmington, Del., for trustee.

Anne Bookout Horgan, Andrew D. Hoffman, Wilmington, Del., William C. Brucker, Bernard M. Schneider, Pittsburgh, Pa., for D & H Terminals, Inc.

Stewart A. Block, Martin L. Stern, Jeffrey T. Green, Washington, D.C., Brian A. Sullivan, Wilmington, Del., for CP, defendants.

Laurie S. Silverstein, Wilmington, Del., for Consolidated Rail Corp.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

The Delaware and Hudson Railway Company, Inc. (DHRC) filed a contingent administrative claim against the Railway Reorganization Estate, Inc., f/k/a Delaware and Hudson Railway Company (D & H) in the amount of $12,000,000. DHRC is a subsidiary of Canadian Pacific Limited and is the successor corporation to D & H Corp. which purchased substantially all of the D & H assets on January 18, 1991. DHRC will be referred to as CP for the purpose of clarity. Francis P. DiCello, the Trustee of the D & H, filed a motion asking the court to estimate that claim at zero for purposes of the plan confirmation process. 11 U.S.C. § 502(c). CP's claim arises out of a dispute concerning "the Oak Island agreement" which involved D & H Terminals (DHT). For the reasons following, the Trustee's motion must be GRANTED.

*Background*

At the time of its bankruptcy filing, the D & H held a license to DHT's Oak Island Terminal in New Jersey. Post-petition, the Trustee entered into a long-term lease with DHT for exclusive use of that license.

That agreement was approved by the court on June 27, 1989.

Around the same time, the Trustee began soliciting bids for the D & H. The Oak Island agreement was included in the package with other relevant documents reviewed by CP and other prospective purchasers.

On January 9, 1990, the Trustee and CP entered into a letter agreement for the sale of substantially all Debtor's assets. The agreement placed D & H's executory contracts and leases into three categories: "Pre–Petition Assumed Contracts"; "Post–Petition Contracts"; and "Selected Contracts." The pre-petition assumed contracts were those contracts and leases already assumed by the Trustee under 11 U.S.C. § 365. The post-petition contracts were defined as those contracts entered into by the Trustee after the filing date except where the Trustee's aggregate liability under any such individual contract exceeded $1,000,000. Finally, the selected contracts were pre-petition unassumed executory contracts and unexpired leases which CP could select among and the Trustee would then assume and assign to CP.

This first sale fell through, due to an unrelated contingency, but CP and the Trustee soon entered into a second letter agreement with the identical classification of contracts on May 15, 1990 (the CP Agreement). The proposed sale was approved under 11 U.S.C. §§ 363(b) and 365 by Order dated June 8, 1990, which explicitly adopted the three contract classifications (Order at ¶ 7). The implementing Order approved the CP Agreement in its entirety, and was binding on both parties.

The parties then executed the Asset Purchase Agreement (APA) on July 13, 1990. The post-petition contracts were listed on Schedule 2.1(h)(ii), the Oak Island agreement was # 19. All post-petition contracts, unlike the unassumed selected contracts, were to be assigned to CP. This was a non-negotiable feature of the CP Agreement. (See Appendix.)

The APA required that all modifications be in writing, subject to any required approval by this court (Section 12.6). Copies of the Bill of Sale (to be signed by the Trustee) and the Undertaking and Assumption Agreement (to be signed by CP) were attached as exhibits A and B. Each contained the proviso that it was subject to the terms of the APA, and in the event of a conflict, the terms of the APA would control.

The APA formed the basis of the Bill of Sale and the Undertaking and Assumption Agreement. Its schedules were copied to provide schedules for closing. Although there is conflicting testimony on this point, at some time during the January 1991 closing week the Oak Island agreement was struck from the list of post-petition contracts to be assigned to CP.

DHT brought a declaratory judgment action against the D & H, CP and others contending that the Oak Island agreement was conveyed to CP at the January 18 closing. CP's contingent administrative claim is based upon its assertion that it did not assume that agreement or, in the alternative, it was damaged by the Trustee's breach of contract.

Thus, the circumstances surrounding the January 18 closing must be reviewed so that the court may value CP's claim by evaluating CP's chances of ultimate success in the litigation. *Bittner v. Borne Chemical Co.,* 691 F.2d 134, 136 (3d Cir. 1982).

*The Evidence*

At trial, CP relied primarily on two pieces of evidence. First, testimony of its outside counsel that an agreement was reached at a December 17, 1990 meeting between the Trustee and CP that the Trustee would not assign, and CP would not assume, the Oak Island agreement. Second, the evidence of the signed Bill of Sale and Undertaking and Assumption Agreement with # 19, the Oak Island agreement, marked off and either the notation "not assigned" or "not assumed" beside it.

■ Putting aside the fact that the Trustee presented evidence to the contrary as to a discussion of dropping the Oak Island agreement from the APA at the

December 17 meeting, we have the problem that CP's understanding was never memorialized in a signed writing. Other important changes to the APA were sent to the Trustee for his signature, as required under Section 12.6 of the APA. The oral understanding alone could not have been an effective modification.

██ More importantly, even if the agreement had been memorialized, that would have been insufficient to remove the Oak Island agreement from the list of post-petition contracts CP was required to assume. The Trustee was under court order to assign that contract to CP; any modification the parties agreed to in writing was still subject to court approval. This is so because any post-petition contract not assigned by the Trustee would result in a priority administrative expense to the estate and was the reason for the required assumption of all post-petition contracts.

██ The Oak Island agreement was never in the group of contracts that could be selected among. CP had no choice. The "Selected Contracts" were those that had not yet been assumed by the Trustee. In connection with closing, the Trustee would assume and assign those contracts selected by CP. If not selected, the Trustee would reject the remaining contracts under § 365. Such rejections would result in unsecured claims, not the administrative claims which enjoy priority. Although not directly relevant here, the first category of contracts, the "Pre–Petition Assumed Contracts," were treated analogously to the "Post–Petition Contracts." Any pre-petition contracts and unexpired leases assumed by the Trustee had to be assumed by CP as they too would have resulted in priority expense claims to the estate's detriment.

██ CP's assertion that the Trustee signed the Bill of Sale and CP signed the Undertaking and Assumption Agreement with # 19 crossed off, even taken as true and uncontested (which it was not), is also insufficient to prevent the assignment of the Oak Island agreement. As noted earlier, in the event of a conflict the terms of the APA controlled over the terms of the Bill of Sale and the Undertaking and Assumption Agreement.

Therefore, the court exercises its discretion to value CP's contingent administrative expense claim at zero for the purposes of confirmation.

An order in accordance with this Memorandum Opinion is attached.

## APPENDIX

### EXCERPT FROM APA

2.1. *Purchase and Sale of Assets.* Upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Trustee agrees to sell, transfer, assign, convey, and deliver to Buyer, and Buyer agrees to purchase, free and clear of all Bankruptcy Encumbrances, all of the Trustee's and D & H's right, title and interest in, to and under all the properties and business owned, held or operated by D & H of every kind and description, wherever located, real, personal or mixed, tangible or intangible, including, without limitation, each of the following (but excluding the assets specifically excluded in this Section 2.1 or Section 2.2 hereof) (collectively, the "Assets"):

\*　　\*　　\*　　\*　　\*　　\*

(h) All:

(i) Pre-petition executory contracts and unexpired real and personal property leases assumed by the Trustee and listed on *Schedule 2.1(h)(i)* (the "Pre–Petition Assumed Contracts");

(ii) Contracts and obligations listed on *Schedule 2.1(h)(ii)* entered into by the Trustee after the commencement of the Proceeding (but excluding any leases and other agreements relating to locomotives, indemnities, guaranties, loans, and agreements of a like nature or purpose in favor of any person other than D & H, whether or not listed on *Schedule 2.1(h)(ii)* (the "Post–Petition Contracts"); and

(iii) Executory contracts and unexpired real and personal property leases to which D & H and/or the Trustee is a

party (including, without limitation, leases and agreements entered into by the Trustee relating to locomotives) which Buyer, in its sole discretion, selects in accordance with Section 6.8 hereof as being necessary or desirable to the operation of the Assets (the "Selected Contracts"), and all of the intangible assets of D & H.